EQUITABLE TRUST COMPANY, a corporation of the State of Delaware, Trustee under the Will of Martha McComb Bush, deceased,

<em>vs.</em>

ELEANOR SNADER, CRAIGE SNADER, CRAIGE SNADER, JR., ALICE DANFORTH OATES, C. REGINALD OATES, JOSHUA DANFORTH BUSH, JR., and HENRY McCOMB BUSH.

<em>New Castle, July</em> 25, 1930.

*John P. Nields*, for complainant.

*William F. Kurtz* and *Thomas McConnell, 3d*, of Philadelphia, Pa., for defendants.

THE CHANCELLOR. The questions in this case concern only that portion of the property in trust which came from the estate of Mrs. Bush's father and over which she was given a power of appointment by her father's will.

The first question is whether or not the devise and bequest by Mrs. Bush of the property over which she enjoyed a power of appointment from her father, is void either in whole or in part because of a violation of the rule against perpetuities.

According to the law in Delaware, the property which she disposed of under the power, was no part of her estate. The case of *Highfield v. Delaware Trust Co.*, (4 *W. W. Harr.*) 152 *A.* 124, decided by the Supreme Court of this State, settles that point. When, therefore, Mrs. Bush undertook to exercise the power conferred upon her by the father she was dealing with his property and the cases hereinbelow cited support the view that her disposition of it is, with respect to the rule against perpetuities, as though Henry S. McComb, the donor of the power, had himself undertaken to create as further limitations those which his daughter, as the donee of a power from him, undertook to create. *Routledge v. Dorrie*, 2 *Ves. Jr.* 357; *In re Powell's Trusts*, (1869) 39 *L. J. Ch. N. S.* 188; *Morgan v. Gronow*, (1873) *L. R.* 16 *Eq.* 1; *Smith's Appeal*, 88 *Pa.* 492; *Minot v. Paine*, 230 *Mass.* 514, 120 *N. E.* 167, 1 *A. L. R.* 365; *Brown v. Columbia Finance & Trust*

*Co.*, 123 *Ky.* 775, 97 *S. W.* 421, 30 *Ky. Law Rep.* 110; *Gambrill v. Gambrill*. 122 *Md.* 563, 89 *A.* 1094; *Matter of Dows*, 167 *N. Y.* 227, 60 *N. E.* 439, 52 *L. R. A.* 433, 88 *Am. St. Rep.* 508.

This being so, we are to inquire whether it would have been permissible for Mr. McComb under the law to limit the property not only to the extent he in fact did, but, in addition, to the extent that his daughter undertook to do.

That the rule against perpetuities would condemn an attempt on the part of Mr. McComb to create limitations reaching into the future so far as his daughter's will undertook to carry them beyond his own, cannot admit of doubt. The bounds which the rule sets to the vesting of an interest is that "it must vest, if at all, not later than twenty-one years after some life in being at the creation of the interest." *Gray, The Rule Against Perpetuities*, (*3d Ed.*) § 201. The rule "is a peremptory command of law, not a rule of construction, its object being to defeat intention." *Taylor, et al., v. Crosson, et al.*, 11 *Del. Ch.* 145, 98 *A.* 375, 376.

The future interests created by the will of Henry S. McComb were all within the outside limits set by the rule. But the added future interests which his daughter, as donee of a power, undertook to create in the unborn children of her children, are in fact outside of the limits set by the rule. To make the matter clear, the situation is as though Mr. McComb had devised and bequeathed property in trust for his daughter, Martha, for life, remainder to her unborn children for life, cross-remainders to their children or the issue of a deceased child absolutely, and if none, remainder over.

If that be the true aspect of the situation which the two wills before the court create, while the life interest in Mrs. Bush's children would be one that of necessity must vest within twenty-one years after a life in being at the time of Mr. McComb's death, yet with respect to the contingent remaindermen, it is plain that the interest given to them would not necessarily vest within twenty-one years after some life which was in being at the time of his death.

The interests which Mrs. Bush undertook to create in the children of her children must therefore be held to be void as being too remote. But the life interest which she gave in trust

for her own children would necessarily vest within the time limited by the rule, reckoning said time from the donor's death.

We have then a case where a part of the disposition is good and the next succeeding part in remainder is void for remoteness. Where that is the case the whole gift will not be struck down, but only that part which is void. *Coggin's Appeal*, 124 *Pa.* 10, 16 *A.* 579, 10 *Am. St. Rep.* 565; *Gambrill v. Gambrill, supra; Lawrence's Estate*, 136 *Pa.* 354, 20 *A.* 521, 11 *L. R. A.* 85, 20 *Am. St. Rep.* 925; *Boyd's Estate*, 199 *Pa.* 487; *Whitman's Estate*, 248 *Pa.* 285, 93 *A.* 1062; *Kern's Estate*, 296 *Pa.* 348, 145 *A.* 824; *In re Powell's Trusts, supra; Minot v. Paine, supra.*

The result thus far is, then, that Mrs. Bush exercised the power of appointment conferred on her by her father to the extent only of creating life estates in trust for her children, and as to the remaining quantity of interest which her father possessed, the power of appointment was not exercised. As to such remainder, Mrs. Bush died in default of appointment, and in that event her father's will provided that it should go to her surviving children. (There was no deceased child.)

Mrs. Bush's children, the defendants herein, are therefore entitled to enjoy a trust estate for life by virtue of their mother's appointment, and an absolute interest in remainder by virtue of their grandfather's will.

This brings us to the second and final question of whether, where that is the situation, the trust estates for life and the remainders in fee coalesce so as to give the defendants a present right to an absolute enjoyment of the entire quantity of interest which their grandfather, Mr. McComb, possessed, free and discharged from any trusts.

In *Volume* 8 *of the Permanent Supplement, R. C. L., at page* 3857, cases are cited in support of the proposition that "where the only purpose of the trust is to preserve the corpus of the fund for the persons entitled to receive it, the acquisition by the life beneficiary of the right to receive the corpus at the termination of the trust, whether by purchase or inheritance, gives such beneficiary the right to have the trust dissolved." This is the principle relied on by the defendants in this cause in support of their claim that they are entitled to have the trustee turn

over to them the entire corpus of each of the four trusts in its possession and control. If this principle be accepted as correctly expressive of the law, yet by the terms of its own statement, it is not operative where the obliteration of the trust would defeat the purpose it was intended to serve. The same citation from *R. C. L. Supplement* recognizes this and refers particularly to those trusts that are created to protect the corpus from the hazard of impairment or waste during the life of the beneficiary as exceptions to the general rule. Spendthrift trusts, such as are found in *Bowlin v. Citizens' Bank & Trust Co.*, 131 *Ark.* 97, 198 *S. W.* 288, 2 *A. L. R.* 575, and in *Moore's Estate*, 198 *Pa.* 611, 48 *A.* 884, are illustrative of this type of cases. A trust such as is found in *In re Hamburger*, 185 *Wis.* 270, 201 *N. W.* 267, 37 *A. L. R.* 1413, where the court found evidence *infra* the will that the testator desired the agency of a trust to protect the corpus of the fund from the hazard of loss, not to protect a remainder but for the benefit of the life beneficiary, falls in this class. The question of whether the trust should be kept alive is one of intent, and it is to be supposed that where the only purpose intended by the trust has ceased to exist, the intent to continue the trust has ended, and this rule has been applied regardless of the fact that the trustee has active duties to perform.

Just what was the purpose of Mrs. Bush in creating the trust estates for life in her children, is not entirely clear. I think however that it reasonably appears that it was solely for the purpose of saving the property from loss or impairment for the benefit of the abortive remainders which she thought she was legally bestowing on her grandchildren. The provision that her daughters should receive the income free from any control of their future husbands might be regarded as indicating a purpose to safeguard the property from the possible danger of marital influence and aggression. But this hardly seems likely for two reasons, first, because the particular language used by her seems to have been adapted to the conception that a husband's rights over his wife's property are now as they were at common law, before the Married Women's Statutes were enacted, the phraseology running according to the old forms when the common law still prevailed; second, the daughters were unmarried at the

date of their mother's will as well as at the date of her death, and there was therefore no reason, based on experience or observation, for her to apprehend any such thing as business incapacity or grasping aggression on the part of husbands whom her daughters might possibly marry in the future; and, lastly, the language in question can have no application to the trusts in favor of her sons for life, which are created by the same stroke of the pen and in the same sentence as those in favor of the daughters. As to the sons, therefore, the only purpose of the trusts must have been to protect the remainders over. I hardly think that the language which exempts the income to the daughters from their husbands' control and debts, can be taken to indicate that the trusts in the corpus belonging to the daughters were to serve a different purpose from that which the trusts in the corpus belonging to the sons must have been meant to serve, when they all are blanketed together by the language creating them.

Furthermore, the will of Mrs. Bush, instead of disclosing an apprehension that her daughters might lack business judgment in the management of their affairs and hence needed, for their own protection, to be shielded against their own improvident management, rather indicates to the contrary, for in Items 14 and 15 the trustee is deprived of all discretion in the matter of the sale of both real estate and personal securities as well as in the reinvestment of proceeds derived therefrom either in real estate or securities, except with the approval of that one of her children, which includes the daughters, who is the *cestui que trust* for life in the real or personal property proposed to be sold or bought.

Thus on the whole it would appear to be reasonably clear that the desire of protecting the children's interest in the property from their own improvidence was not the motive which inspired the creation of the trusts. I conclude, then, that the trusts must have been created for the purpose of safeguarding the remainders, which however as before stated are void.

We have then trusts created to protect estates for the benefit of remainders which have failed of their purpose, and the question is whether the life tenants who are also vested with the absolute rights in remainder by virtue of their grandfather's will are

entitled to a declaration that the trusts are terminated and to a decree ordering the corpus to be transferred to them absolutely. The intent of the creator of a trust is a highly important factor, if not a controlling one, when the question of its termination is presented. Of course if the trust is not a lawful or permissible one, the intent underlying its creation will be ignored. Considerable liberality, however, is to be indulged in favor of the donor's wishes, for after all the owner of property has, as he ought to have, the right to attach conditions to his bounty which within reasonable limits should be respected. It was so held in *De Ladson v. Crawford, Trustee*, 93 *Conn.* 402, 106 *A.* 326, 329, where the court refused to decree the termination of a trust to hold property for ten years, pay the income to a husband, and after ten years to turn the property over to the husband absolutely. In that case the court found no obstacle in the way of the right of a testator "to exercise his own discretion by postponing the enjoyment of the principal for a term of years, without explaining to the public his reasons for doing so," and refused to allow the legal doctrine of merger arbitrarily to overturn the testamentary wish. That case, however, is hardly applicable here, for in this case the intent of Mrs. Bush was neither expressly or impliedly disclosed with respect to her children in their role of remaindermen. As far as I can see, her sole intent was to create the life estates in trust solely to protect ineffective remainders in her grandchildren. So that the case, as before stated, is one where the disclosed purpose is one that has failed of realization.

If it be granted that the doctrine of merger, or more correctly speaking of termination, for which the defendants contend as a general proposition is a sound one, yet a difficulty arises in applying it to this case. It is to be borne in mind that Mrs. Bush directed a division of the appointive estate into four parts and an allotment of each part in trust for the life of each child. The division and allotment were duly made. The four parts as a matter of fact are now unequal in value. Each child was given a life interest in trust in the share allotted to him or her, and it is only the income from a particular allotment that each child is entitled to receive. Such is the manner in which Mrs. Bush

exercised the power conferred on her. To that extent, it is conceded, she effectively acted within the scope of her power. If this exercise of the power is to be recognized, as it must be, we must of course take the language in which she couched it as binding. That being so, she gave a specific portion of the appointive estate, to be later ascertained by division and allotment, in trust for each child for life. At that point her disposition as a legal proposition ended.

Each of the four children therefore received an equitable estate for life in a definite portion of property. The interests were several. But by virtue of their grandfather's will they all four as tenants in common are ultimately entitled to receive the entire appointive estate constituting the corpus of the four distinct and unequal trusts. What each child as tenant in common is therefore entitled to receive outright in remainder, has an entirely different identity from that which each is to enjoy as a trust beneficiary for life.

Now, that being the case, would it be proper to declare a termination of these trusts? In all the cases I have examined there was a perfect identity between the corpus comprising the beneficial estate for life and the corpus constituting the interest in remainder. Such identity of corpus would seem to be a prerequisite before the acquisition of the latter could be held to terminate the former. Putting a simple illustration, it certainly cannot be that acquisition of an interest by way of remainder in Blackacre can have any relation or effect upon a life interest by way of trust in Whiteacre. Here of course the case is not quite so simple as the one just put, for what we have here is four life interests in four respective, distinct and unequal trusts, and a remainder over of an absolute interest in each trust belonging to the four life interests in common, each owning a one-fourth thereof. Therefore as to each child, there has been an acquisition of the absolute interest in remainder to the extent of one-fourth of the trust of which he or she is the life beneficiary, as well as of the trusts of which the other three are life beneficiaries. Conceding a termination, how can it operate beyond the one-fourth interest in remainder which each child has in the distinct part composing the trust set apart for his or her own life? How could

it operate to the extreme extent of obliterating the entire trust interests in all the parcels, as contended for by the defendants?

Whether the questions just suggested have any pertinency, and if so any controlling influence, under the peculiar facts in the instant case, was not debated at the argument. Indeed, they were not noticed. The solicitors in the cause, if they so desire, will be afforded an opportunity to give the court the benefit of their views touching them, before a decree is entered. Final disposition of the cause will therefore be put over pending further argument if desired.